UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER GROOME,                      )
                    Petitioner     )
v.                                 )
                                   )          Civil Action No: 03-12397-PBS
                                   )
TIMOTHY HALL,                      )
                    Respondent.    )
                                   )

## THE PETITIONER'S CONSOLIDATED MEMORANDUM IN SUPPORT OF HIS APPLICATION FOR A WRIT OF HABEAS CORPUS AND OPPOSITION TO THE RESPONDENT'S MOTION TO DISMISS

The petitioner, Peter Groome, moves this Court for a writ of habeas corpus as he is held in violation of the Constitution, laws and treaties of the United States. Specifically, the petitioner is held in violation of his rights afforded by the Fifth and Fourteenth Amendments to the U.S. Constitution. The petitioner was subjected to custodial interrogation and was coerced into waiving his rights in contravention of Miranda v. Arizona, 384 U.S. 436 (1966). The court's decision not to instruct on the lessor offense of voluntary manslaughter is contrary to federal law. The petitioner's trial attorneys provided ineffective assistance to him as they waived an important means to have his statement suppressed, and the expert testimony presented at his trial, which represented his only defense, was inadequate.

For the above reasons and those detailed below, the petitioner respectfully asks this Court to exercise the powers granted to it and issue a writ of habeas corpus.

## PROCEDURAL BACKGROUND

On December 30, 1997, a Barnstable County grand jury returned two indictments charging the petitioner Peter Groome with murder (no. 47807) and larceny of a motor vehicle (no. 47808). The indictments stem from the death of Elsie Korpela which occurred in the driveway of her home in Hyannis on December 8, 1997.

A hearing on the petitioner's motion to suppress statements, before Dolan, J., began on November 2, 1998 and concluded on November 4, 1998. The motion was denied. The defendant's jury trial before O'Neill, J., began on April 23, 1999 and concluded on April 29, 1999, when the defendant was found guilty of murder in the first degree with deliberately premeditated malice afterthought and with extreme atrocity and cruelty, and of the lesser included offense of unauthorized use of a motor vehicle. The defendant was sentenced on no. 47807 to the term of natural life at the Massachusetts Correctional Institution at Cedar Junction. The petitioner is serving his sentence at Old Colony Correctional Center in Bridgewater, Massachusetts. Indictment no. 47808 was placed on file.

The petitioner appealed his conviction to the Supreme Judicial Court on July 26, 1999. The Supreme Judicial Court affirmed the petitioner's convictions on October 5, 2001 and in a corrected decision on October 22, 2001.

In support of his motion for a new trial, the petitioner filed a motion for funds to retain a psychiatric expert for a new trial motion on November 20, 2001. The court denied his motion on December 4, 2001. The petitioner filed a motion for reconsideration on December 4 2001. On December 6, 2001, the court granted the petitioner's motion for funds. The petitioner filed his

2

motion for new trial on January 2, 2002. The trial court denied his motion and he appealed to the

Supreme Judicial Court pursuant to Mass. G. L. c. 278, 33E, the so called gatekeeper statute by

which the Supreme Judicial Court reviews first degree murder convictions. A single justice of

the Supreme Judicial Court denied the defendant's gatekeeper petition on November 20, 2003.

The justice's decision was received and docketed by the trial court on November 24, 2003. The

petitioner filed his application for a writ of habeas corpus on November 26, 2003.


## STATEMENT OF FACTS

The petitioner submits a brief summary of the facts and evidence that pertain to his claims

for relief in this Court.

### The Murder of Elsie Korpela

On or about December 8, 1997, the body of Elsie Korpela was found under a car in her

driveway at her home in Hyannis, Massachusetts. A subsequent medical examination concluded

that she had been stabbed multiple times. Korpela and her boyfriend, the petitioner, Peter

Groome ("Groome" or "petitioner"), had spent the prior weekend in New York City, returning to

Cape Cod sometime on the evening of December 7th. In a written statement that was not

suppressed (see discussion concerning motion to suppress, post.), Groome admitted stabbing

Korpela during an argument on the evening of December 7th. Korpela and Groome had been

drinking earlier that evening, Groome had tried to end the relationship, and Korpela, in response,

told him that she had AIDS and he probably did as well. The two argued in the driveway of

Korpela's home. Groome picked up a chisel that was lying on the roof of her car and struck her

with it.

## The Police Investigation And Interrogation[1]

In their initial investigation on the morning of December 8, 1997, Barnstable police officers learned that Groome was Korpela's boyfriend, and they ascertained that the car under which her body was found was registered to him. Korpela's car, a Volvo, was not in the driveway. The police did not find Groome at his residence in West Barnstable, but they learned that he worked as a teacher's aide at the F.L. Chamberlain School in Middleboro, Massachusetts. Two state troopers, Kelliher and Gordon, went to the school to interview Groome. When Groome arrived, the officers told him that they had been asked to locate him and that two other officers were coming from the Cape to talk with him about the missing Volvo. Kelliher told Groome that their interview related to a reported stolen car. They did not mention Ms. Korpela or that she had been found dead under Groome's car. The police asked Groome "if he had the keys to the [Ms. Korpela's] car, which was missing from the scene and about which the police wanted to question him. [2] The petitioner acquiesced, turning over the keys which were located inside his jacket. [3] He told the officers that he had traded cars with his girlfriend so that she could take his car to have an oil change in Hyannis that day because she got off work earlier than he did. Gordon took Groome's license and green card to his cruiser to run a warrant check. Kelliher remained with him. As of that time, the petitioner had not been informed of his Miranda rights by either officer. Groome was in the presence of Kelliher and Gordon for about twenty minutes

---

[1]Except as where indicated, the following facts are taken from the Memorandum of Decision on Defendant's Motion to Suppress, attached hereto as Exhibit "A."

[2]The defendant had driven that car from his home in Barnstable to work at the Chamberlain School that morning.

[3]Although the judge made no findings in this regard, this evidence was uncontested.

4

before the other officers arrived from the Cape. [4]

There was no evidence that any other people were in the vicinity while the petitioner waited with the police. [5]  At some point, Groome asked to get a drink of water or to go to the bathroom and was permitted to go inside the building also to do so.  There was no evidence that Gordon gave the license, resident alien card, or keys back to the defendant during this waiting period, and there are no findings to the effect.[6]  Similarly, there was no evidence that Groome was told that he was not under arrest or that he was free to leave.

Before 2:00 p.m., the officers from the Cape, Detective Balcom and Trooper Kotfila, arrived and joined the others.[7]  These officers were told by Gordon and Kelliher that the Volvo had been located and that they had the keys.[8]  Balcom and Kotfila informed Groome that they were investigating a Volvo that had been reported stolen.  Groome was not given Miranda warnings by either Balcom or Kotfila.  Groome again said that he had traded cars with his girlfriend in order to have the oil in his car changed.  The police then asked Groome to accompany them back to the Cape, to which he agreed.  Although the officers did not refer to

---

[4]Although the judge found that the officers arrived twenty minutes later, the only evidence at the motion hearing was that the period was closer to forty minutes.

[5]During their encounter with the defendant the officers observed that he was chain smoking, shaky and appeared nervous.  Lt. Kelliher noticed that he seemed to be very nervous and [h]e was chain smoking, chain smoking practically continuously.  Kelliher also observed that the defendant's hands were trembling.

[6]It can be inferred that Groome's identification cards were returned to him at some point, because he had them in his possession later at the police barracks.

[7]Groome believed he was in custody from the time he first encountered Troopers Kelliher and Gordon in the parking lot outside the school.

[8]Although the judge made no findings in this regard, this evidence was uncontested.

5

handcuffs, Groome requested that they not handcuff him in front of the children. Kotfila informed Groome that he was not under arrest. The officers and the petitioner entered the cruiser and commenced the forty-five minute journey back to the State Police Barracks at the Cape. During the journey, there was general conversation about the fact that Groome was an Irish national and some general conversation about Ireland. Groome testified at the hearing on the motion to suppress that the group in the vehicle observed several television and media trucks crossing the bridge, to which one of the troopers remarked that, "Something big must be happening on the Cape."[9]

The officers "delivered" Groome to the State Police barracks in South Yarmouth at about 2:50 p.m. where he was turned over to Trooper Jack Mawn and Police Detective James Tamash. Detective Tamash was the lead officer from the Barnstable Police Department.

It was about 2:50 p.m., in an interview room on the second floor of the barracks, when Mawn and Tamash began to interview Groome. Tamash, a Barnstable Police officer for thirty years, testified that Mawn told Groome "that we were doing an investigation and that we would like to talk to him about the black Volvo that he had in his possession that day." Mawn asked Groome for some biographical information, which he provided. Groome asked to use the bathroom and was permitted to do so. He was instructed by the officers not to wash his hands. He went unaccompanied to the bathroom which was located on the same floor.

When Groome returned, Trooper Mawn commented on his accent and he responded that he was born in Ireland, which they discussed. The officers learned that he was an Irish national

---

[9]Although the motion judge did not find these facts material, there appears to be no dispute that they took place.

6

and was currently a resident alien in the United State and had to renew this status every [ten] years. Groome again asked to use the bathroom and again this was permitted. When he came back to the interview room, he asked if he had to "stay here." Trooper Mawn told him that he did not have to "stay here." Trooper Mawn told him that "we're not the British Army, you're not a suspected Irish Republican Army collaborator, you're free to go, but we have some questions that we would like to ask you, but we can't make you stay here."

The petitioner then stated that he had been told that there was a problem with his girlfriend's car. Mawn told him that there was a problem with the car and that the officers had some questions that they wanted to ask him about the car. In response, Groome repeated the explanation that he told first to the officers from Plymouth County at the Chamberlain School and then to Trooper Kotfila and Detective Balcom. Groome told Mawn and Tamash that the reason he had Ms. Korpela's car was that she was going to take his car for an oil change. He said that he had been told by other officers that the car had been reported stolen. The officers told him that the car was listed stolen, that it had been reported stolen by Elsie Korpela's relatives, and that the reason Elsie did not report it was because Elsie was dead. This conversation occurred sometime between 3:15 and 3:30, approximately 25 to 40 minutes after commencement of the interview. On receipt of this information, the petitioner appeared visibly shaken and was trembling and gagging. He was allowed to leave the room for use of the bathroom. He was given a drink of water and allowed to smoke a cigarette. Because the defendant was trembling and had difficulty lighting his cigarette, Trooper Mawn did it for him. At this point, Groome

7

requested a "solicitor," to which Trooper Mawn responded, "What?"[10]  The defendant testified

that he then said an attorney and explained, "we call them solicitors," to which Mawn responded,

"you're not being charged with anything right now."[11]  At this point, the interview commenced

again.

At about 4:00 p.m., Trooper Mawn was called out of the interview room and as he rose to

leave, the petitioner again requested and was permitted to use the bathroom.  When Mawn left

the room at about 4:00 p.m., he spoke to Trooper Knott, who told him that the police from

Plymouth had called and that had observed what appeared to be blood splatter on the black

Volvo.[12]  Mawn stated that it was upon receipt of this information that he decided it was time to

arrest the petitioner and inform him of his legal rights pursuant to Miranda.

When Trooper Mawn returned to the interview room he said to Groome, "[w]e have a

problem."  Mawn informed him of the detection of blood on the Volvo.  Mawn said that the

presence of the blood indicates that the Volvo was likely to have been at the scene when Elsie

was assaulted and that it was a serious problem for Groome as it was not consistent with what he

---

[10]This conversation occurred thirty to forty-five minutes before Trooper Mawn decided to read Groome his Miranda rights.

[11]On this issue the motion judge did not credit the testimonies of Trooper Mawn or Detective Tamash, both of whom denied that the defendant ever mentioned a solicitor or an attorney.  Tamash had testified that the defendant never said anything about a lawyer.  Mawn had testified that the defendant did not ask for a lawyer and did not ask for a solicitor.

[12]Mawn, the lead investigator on the case, claimed that he was not informed by any of the other state police officers who were assisting him that "minutes after" Balcom and Kotfila had departed from the Chamberlain School with the defendant, and before 2:00 p.m., the State Police in Plymouth had discovered tell-tale blood spatter on the Volvo.  Lt. Kelliher's testimony about when he contacted the State Police on the Cape and whom he spoke to of this significant discovery was vague.  Kelliher did recall calling the State Police Crime Scene Services.

8

had told them about taking the Volvo back to his residence the night before. Mawn testified "I told him that this presents a serious problem for you." It was at this point, just prior to 4:11 p.m., that Groome was first informed of his legal rights by being read the <u>Miranda</u> warnings and handed a form to read. He promptly signed the "Statement of Rights" portion of the form at 4:11 p.m.[13]

The other section of the rights form entitled "Waiver," was also presented to the petitioner but was not signed until 5:17 p.m., one hour and six minutes later. The petitioner was reluctant to sign this waiver and stated that he did not know what to do. Groome testified that the reason he did not sign it right away is because he again asked for an attorney.[14] He testified that he told the officers he needed to go outside "to get some air because he was choking in there." The officers kept "asking and suggesting" that he sign the waiver. Both Groome and Tamash testified that Mawn stated there would be no point in going outside for a walk unless he signed the waiver because it would be of no benefit. Mawn testified that prior to signing the form, Groome hesitated and stated that he was "unsure what to do regarding the waiver" and Mawn told him that if he wanted to call an attorney he could do so. Detective Tamash testified that the petitioner was reluctant to sign the waiver portion and that Mawn kept explaining the waiver portion to him as many as <u>five times</u>. During this sixty-six minute period the petitioner

---

[13]The judge found that the defendant had one previous exposure to <u>Miranda</u> warnings when he had been arrested for driving under the influence and he knew from that experience that he was entitled to a lawyer as he had received one on that occasion. This finding is not supported in the record. The defendant testified that he had been arrested before and that he had experience before in the court system and that he had been appointed a lawyer in Quincy, Massachusetts. However, there was no evidence that the defendant had ever been given <u>Miranda</u> warnings.

[14]The motion judge did not find that Groome asked for an attorney on this second occasion.

gagged into a wastepaper basket twice. He was also visibly shaking.

Groome ultimately signed the waiver at 5:17 p.m. Immediately after he signed, the officers took him out for a walk to a CVS pharmacy where he was allowed to purchase cigarettes. Prior to going for their walk, Mawn informed him that he was under arrest for murder. Although in custody and charged with murder, Groome was given his wallet and his coat and was not handcuffed during the walk.

Trooper Mawn testified that, on the walk back to the police barracks, Groome said, "I won't lie to you guys anymore, I killed her... I just couldn't stop... I was like an animal, an animal."

After a brief confrontation with the media outside the police barracks, they proceeded back inside and returned to the interview room on the second floor. The petitioner continued talking to the police and revealed the complete story of what occurred on Sunday night when he and Ms. Korpela returned home from New York

Groome signed a written statement at 9:20 p.m.

Groome testified at the hearing on the motion to suppress. At the time of his testimony, November 3, 1998, he was thirty years old. He was born in Ireland and attended school there until he was fifteen, when he left school. He came to the United States in September of 1992. He had been living in the United States for about five years when the incident occurred.

### The Motion to Suppress

The hearing on the motion to suppress took place November 2-4, 1998 before Judge Dolan of the Barnstable Superior Court. The testimony was along the lines set forth above and as summarized in Exhibit "A" hereto.

10

The motion judge ruled that the Commonwealth proved beyond a reasonable doubt that "the defendant was not in custody during the period when he was located at his place of employment by the Plymouth County officers nor while he was being transported back to Cape Cod by the State Police detectives." The judge ruled that it was not until "about 4:00 p.m. when Trooper Mawn determined that he was under arrest and gave him his Miranda warnings" that a custodial situation took place. The judge also ruled, "[b]ased upon the totality of all the circumstances," that the Commonwealth proved that Groome's statement was not coerced and was the product of a rational mind.

The motion judge focused mostly on the 66 minutes between when Groome signed the Miranda form (4:11 p.m.) and when he signed the "waiver" portion of the form (5:17 p.m.). The judge held that, since the petitioner continued to speak with the officers during that period, he was "reluctant to break off any further conversation," thereby averring his willingness to continue to speak with them. The judge found that the officers informed Groome how to terminate the interrogation but that he chose not to. The judge also found that Groome's testimony at the motion hearing that he requested an attorney during this interval was not credible.

**The Trial**

The government's evidence at trial was essentially the same as that produced at the motion hearing. A copy of Groome's written statement was introduced into evidence. In addition, medical and scientific evidence was introduced regarding the manner and cause of the victim's death, as well as forensic evidence of tests performed and photographs taken. This evidence was largely uncontested and is not the subject of this petition, and therefore will not be detailed.

11

Groome did not testify in his own defense at trial. Instead, he proceeded with a defense theory that he lacked the requisite mental intent to commit first degree murder.

Allen Brown, a psychologist affiliated with the Massachusetts General Hospital and a clinical instructor of psychiatry at Harvard Medical School, gave an expert opinion regarding Groome's mental status at the time of the incident. Dr. Brown testified that Groome suffered from depression, intermittent explosive disorder, alcohol abuse and dependence, and borderline personality disorder. This opinion was based upon three clinical interviews of Groome at Bridgewater State Hospital, psychological testing, and a review of medical records and legal records pertaining to the case. Groome was tested with the "personality assessment inventory," an objective psychological test used to aid in the diagnosis of mental disorders or psychiatric disorders and in the identification of maladaptive psychological traits.

Dr. Brown testified that intermittent explosive disorder causes a person to have uncontrollable fits of violence, usually because of some type of provocation. It was Dr. Brown's opinion that, during the incident, Groome was in the midst of an episode of intermittent explosive disorder and as a result, he would not have been thinking or acting rationally and would not have had control over himself. Dr. Brown also stated that the use and abuse of alcohol would lead to impaired judgment and lowered impulse control.

The jury found Groome guilty of first degree murder. The conviction was affirmed by the Massachusetts Supreme Judicial Court in an opinion dated October 5, 2001, but issued as a corrected decision on October 22, 2001. A copy of the decision of the Supreme Judicial Court is attached hereto as Exhibit "B."

### Motion for New Trial

The Committee for Public Counsel Services appointed present counsel to investigate possible grounds for collateral review of the verdict. Counsel learned that the petitioner was an Irish national and had not been informed of his rights to contact his consulate as provided by the Vienna Convention on Consular Relations of 1963. Counsel learned from an independent pro bono psychiatric evaluation that there were some questions about whether the expert testimony presented at the petitioner's trial had been accurate. Based on this information, petitioner's counsel submitted a motion for funds under the amended Mass. R. Crim. P. 30(c), Post Conviction Procedure. On November 20, 2001, Petitioner filed his motion with a supporting affidavit of counsel. See Motion for Funds attached hereto as Exhibit "C." On December 3, 2001, the court denied the motion as being "immature at this time." See Court's Denial attached hereto as Exhibit "D. " The petitioner filed a motion for reconsideration on December 4, 2001. The Court granted the motion on December 6, 2001. See Exhibits "E" and "F". On January 2, 2002, the petitioner filed a motion for new trial in the Barnstable Superior Court in an effort to exhaust all the remedies available to him in the courts of Massachusetts. See Exhibit "I."

The petitioner's motion for new trial raised two claims that the petitioner had been denied the effective assistance of counsel. The petitioner raised the issue that his trial attorneys had waived a means to have his statement suppressed under the Vienna Convention on Consular Relations of 1963 and that he had been denied effective assistance because the expert testimony, representing his only defense at trial, was patently inadequate. On February 7, 2002, the trial court denied the motion and the petitioner timely filed an application for review by a single justice of the SJC pursuant to Mass. G. L. C. 278, §33E. See Exhibit "J." On November 20,

2003, the SJC denied Groome's gatekeeper petition, and the decision was docketed in the

Superior Court on November 24, 2003.  Groome filed his petition for habeas corpus in this court

on November 26, 2003.

## ARGUMENT

I.     **The Court Should Issue A Writ of Habeas Corpus As The Petitioner Is Incarcerated In Violation Of The Constitution, Laws And Treaties Of The United States**

"The Supreme Court, a Justice thereof, a circuit judge or a district court shall entertain an

application for a writ of habeas corpus in behalf of a person in custody pursuant to a judgment

of a State court only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States."  See 28 U.S.C. § 2254 (a).

"An application for a writ of habeas corpus . . . shall not be granted . . . unless the

adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court of the United

States."  See 28 U.S.C. § 2254 (d)(1).  "Clearly established law" is the law of the Supreme Court

of the United States that was clearly established at the time the state conviction became final.

Williams v. Taylor, 529 U.S. 362, 381-382 (2000).

The statute provides two avenues of relief from the federal court.  Under the "contrary

to" prong, the petitioner is entitled to relief where a state court "arrives at a conclusion opposite

to that reached by the [Supreme Court] on a question of law or if the state court decides a case

differently than the [Supreme Court] has on a set of materially indistinguishable facts."  Williams

v. Taylor, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" prong, a

14

petitioner is entitled to relief "where the state identifies the correct legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The state's court decision must be unreasonable, not simply incorrect. Id. at 410-411. Unreasonableness is tested by an objective standard. Id.

### A. The Petitioner is Incarcerated in Violation of the Fifth Amendment of U.S. Constitution as He was Subjected to Custodial Interrogation Without the Benefit of Miranda and His Waiver Was Involuntary.

#### 1. Standard of Review

A state court's determination that an individual was not in custody for purposes of the application of Miranda is not entitled to the statutory presumption of correctness. Thompson v. Keohane, 516 U.S. 99, 113 (1995). The question of custody is a mixed question of law and fact that warrants an independent review by the federal habeas court. Id. A state court's finding as to historical facts or questions of credibility are entitled to the presumption of correctness. Id. at 110-111. See 28 U.S.C. § 2254 (e)(1).

In determining whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest " the court must conduct two distinct inquires. Thompson v. Keohane, 516 U.S. at 112 quoting California v. Beheler, 463 U.S. 1121, 1125 (1983). The first inquiry concerns the facts and circumstances surrounding the interrogation. Id. The facts found here by the trial court are presumed correct unless rebutted by the petitioner with clear and convincing evidence. Id.; See 28 U.S.C. § 2254 (e)(1). The second inquiry involves applying the objective standard to the historical facts and determining whether an individual was

15

in custody and subjected to interrogation. Id. at 112-113. This ultimate determination is a mixed question of fact and law subject to the federal court's independent review. Id.

## 2.     The State Court's Decision That The Petitioner Was Not Subject To Custodial Interrogation Was An Unreasonable Application Of Clearly Established Federal Law.

The Court's decision that the petitioner was not subjected to custodial interrogation was an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254 (d)(1). Clear United States Supreme Court precedent dictates that the petitioner's freedom of action was deprived in a significant way requiring Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Here, the petitioner's freedom of action was deprived in a significant way. The motion court's finding that the petitioner was not in custody was an unreasonable application of the principles of Miranda to the overwhelming evidence to the contrary.[15] The historical facts are as follows: three state police officers came to the petitioner's place of work. The petitioner asked that he not be handcuffed. One officer took the petitioner's driver's license and identification (green card). The petitioner is an Irish national. The petitioner was taken to the State Police barracks in Yarmouth by two officers where he was "turned over to State Police Trooper Jack Mawn and Barnstable Police Detective James Tamash." See Exhibit "A" at p.4. The petitioner did not have a car and he lived in West Barnstable. Once the petitioner was delivered to the state

---

[15]The motion court's rulings reveal that it did not understand the controlling legal principle and its application. The motion court ruled "[i]t was not until about 4:00 p.m. when Trooper Mawn determined that he [the petitioner] was under arrest and gave him his Miranda warnings did a custodial situation take place." An individual can be "under arrest" and subjected to conditions that require Miranda warnings before an individual is actually informed that he is "under arrest."

police barracks he was taken upstairs to a room on the second floor of the barracks. While one of the officer testified that the petitioner was free to go, this statement was meaningless as the petitioner did not have a vehicle and the police had taken his personal items from him. An individual's freedom of action may be deprived in a significant way when he has no means to leave the place of the police questioning. Cf. Oregon v. Mathison, 429 U.S. 492 (1977)(place of police questioning was two blocks from the defendant's apartment). Upon entry into the interview room, petitioner was asked to empty his pockets of his personal effects, which he did. He was instructed not to wash his hands when he went to the bathroom. Further, as the motion judge recognized, the petitioner did not feel he was free to leave at any time. Petitioner "asked" to use the bathroom on several occasions and was told that he could. The petitioner was alone with the two officers.

The petitioner was the chief, and later the only suspect. The petitioner was the victim's current boyfriend. His car had been found on parked on top of the deceased victim, and he was found in possession of the victim's Volvo. The police certainly intended to gain information from him because they were untruthful when they initially told Groome their reasons for interviewing him at the Chamberlain School. Although they knew that Korpela was dead and probably had been murdered, Kelliher and Gordon created a ruse that they were simply investigating a missing car.

Assuming the facts found by the motion court, no reasonable person would believe that he was free to leave the state police barracks. The petitioner had been brought to a "police dominated atmosphere" -- the state police barracks -- and he did not have any means of transportation to leave the barracks. Miranda at 456. His identification and green card had been

17

taken from him and the police had clearly began to focus their investigation on him even if only for the "stolen" Volvo. He was told not to wash his hands. The petitioner had been in the presence of police officers for several hours. He was alone with the officers in the interview room. Illinois v. Perkins, 496 U.S. 292, 296 (1990) quoting Miranda v. Arizona, 384 U.S. at 445 ("'the principle psychological factor contributing to a successful interrogation is privacy– being alone with the person under interrogation.'") He was the murder victim's current boyfriend and his car had been found parked on top of her. Weighing the totality of the circumstances, the petitioner was in custody and subject to interrogation before 4:00 p.m. and should have been informed of his Miranda rights shortly after he was brought to the State police barracks.[16] Had the petitioner been given his Miranda rights at an earlier point of the "interview" he would have been less likely to "waive" his rights as his physical and mental condition would not have been as deteriorated.

The court's finding that Groome was not subjected to custodial interrogation before 4:00 p.m. when the officer informed Groome that he was under arrest is an unreasonable application of Miranda. It is an incorrect and erroneous conclusion. No reasonable person would believe that he was free to leave in the circumstances that Groome found himself. Groome had been brought to the state police barracks, his identification and license had been taken from him, he no means of transportation to leave, he was alone with two officers, and he was directed not to wash his hands. Additionally, the officers confronted the petitioner with his "pre- Miranda" statement that

---

[16]Whether a statement is characterized as inculpatory or exculpatory is not determinative for purposes of Miranda. Miranda at 476-477. The motion court found that "[a]ny statement given pre-Miranda was not inculpatory." See Exhibit "A" at p. 13. This finding by the motion court ignored the law and that the petitioner's statements were inculpatory because they placed him with the murder victim on the night she was killed.

he had exchanged cars with the victim after the blood was found.

Looking at the totality of the circumstances the petitioner was in custody and subjected to interrogation prior to 4:00 p.m.

### 3. The Court's Findings that the Petitioner Voluntarily Waived His Miranda Rights Is Contrary to And An Unreasonable Application of Clearly Established Federal Law. Alternatively, There Is Clear and Convincing Evidence that the Petitioner Asked for An Attorney

#### A. The Petitioner Did Not Voluntarily Waive His Rights

The waiver of constitutional rights must be done voluntarily, knowingly, and intelligently. Johnson v. Zerbst, 304 U.S. 458 (1938). Courts are to presume that a defendant did not waive his rights. North Carolina v. Butler, 441 U.S. 369, 373 (1979). Finding the waiver of the rights afforded by Miranda is a two step inquiry. Moran v. Burbine, 475 U.S. 412, 421 (1986). First, the waiver must be voluntary meaning that it was the "product of free and deliberate choice rather than the result of intimidation, coercion or deception." Moran at 421. Secondly, the waiver must be made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. In making this determination the court looks at the "totality of the circumstances" surrounding the interrogation. Id.

Based on the motion court's factual findings, petitioner's waiver clearly was not voluntary. The motion court's findings that the petitioner's waiver was voluntary were unreasonable and incorrect. In evaluating a waiver, the court must scrutinize the totality of the circumstances leading up to the purported waiver including the personal characteristics of the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). Where a defendant in custody is "worn down" by police interrogation tactics or subjected to trickery, deceit, or coercion, the

19

waiver is not voluntary. <u>Moran v. Burbine</u>, 475 U.S. at 421; <u>Fare v. Michael C.</u>, 442 U.S. 707, 726-727 (1979). Coercion is evaluated from the suspect's perspective. <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990).

With these principles in mind, it is clear the motion court failed to consider some critical facts in relation to the petitioner's purported waiver, and the petitioner respectfully submits that the motion court misunderstood and misapplied the applicable law. Most critically 66 minutes elapsed between the time the police advised Groome of his rights and when he signed the waiver form. During that time, the petitioner, indisputably under extreme stress, asked to go outside for a walk. The officers then used the prospect of a walk as leverage through which they coerced Groome into signing the waiver. Viewing the facts in an objective light, the officers had worn down their suspect to the extent that if they allowed him to go outside, he would have signed anything they put in front of him. The motion court credits that a walk was discussed between the petitioner and the officers, but the court does not address the implications of this significant fact on the voluntariness of the petitioner's waiver. The motion court found that the petitioner had still not signed the waiver portion of the form when he asked to go outside for walk and that the officers told the petitioner that a walk would not benefit anyone since they could not talk with him. <u>See</u> Exhibit "A" at p. 10.[17] The petitioner signed the waiver and was taken for a walk. The motion court found that the petitioner stated "'[t]his will probably be my last walk for a long time.'" <u>Id</u>. Despite these findings, the motion court does not consider that the petitioner's waiver

---

[17] The importance of the promised walk was recognized by the Supreme Judicial Court. <u>Id</u>. at fn. 25. The Supreme Judicial Court remarked that the petitioner was taken on a walk which was a "highly unusual promise"after he had been placed under arrest for murder. <u>Commonwealth v. Groome</u>, 435 Mass. 201, 218 (2001).