was obtained by coercion by giving him the promised walk. "'Coercion can be mental as well as physical.'" Miranda at 448 quoting Chambers v. Florida, 309 U.S. 227 (1940).

The motion court also did not evaluate that the police had been "persistent."[18]  See Exhibit "A" at 8-9,14. The court finds that the officers had explained the waiver portion of the form several times to the petitioner. See Exhibit "A" at 8-9,14. While the motion court credited the fact the officers were "persistent" in their conduct with the petitioner between 4:11 p.m. and 5:17 p.m., the court does not evaluate the significance of this fact along with the other facts. See Exhibit "A" at p. 14. Persistence in questioning and/or obtaining a waiver is a significant factor. The U.S. Supreme Court in Miranda reviewed several police interrogation manuals which detail the procedures employed by the police. Id. One manual acknowledges that "[w]here emotional appeals and tricks are employed to no avail, [the police] must rely on an oppressive atmosphere of persistence." Id. at 451, 455. The motion court does not address the officers' persistence alone, or more importantly in conjunction with the walk.

Additionally, the motion judge erred in failing to evaluate the petitioner's physical and mental state. He was observed by the police to be shaking. The court found that after the petitioner had signed the acknowledgment portion of the Miranda form, that he began to "gag with 'dry heaves' to the extent that he was handed a wastepaper basket." See Exhibit "A" at p. 9. Based on these facts, which the motion judge correctly credited, she erred in not taking the additional step of holding that they effected the voluntariness of Groome's waiver and confession.

---

[18]Trooper Tamash testified that Trooper Mawn had explained five times to the petitioner about the "waiver" portion of the Miranda rights form. See Motion Transcript at Volume II, 274-283. This testimony was affirmed by the petitioner's testimony.

Examining the totality of the circumstances, the petitioner's waiver of his <u>Miranda</u> rights was <u>not voluntary</u>. The petitioner's waiver was obtained by coercion and the persistence of the officers coupled with his weak physical condition. The officers obtained the petitioner's waiver by promising him a walk which the petitioner's own testimony, credited by the motion court, shows was a thing of value to him. The walk was given to the petitioner after the officers had persistently "explained" to the petitioner repeatedly about the waiver. " . . .[A]ny evidence that the accused was threatened, tricked or cajoled into a waiver, will of course show that the defendant did not voluntarily waive his privilege." <u>Miranda</u> at 476. Given the strong evidence that the petitioner was coerced into his waiver, the motion court's finding that his waiver was voluntary may not stand. [19]

The court's finding that the petitioner voluntarily waived his right to counsel is contrary to clear law. Specifically, the court did not examine several circumstances in the "totality of circumstances" crucible that are legally significant. Clear U.S. Supreme Court precedent dictates that a waiver of constitutional rights must be the "product of free and deliberate choice"

---

[19] The Supreme Judicial Court found that the fact that the petitioner had delayed in signing the form did not invalidate his verbal waiver, that he wanted to speak with the officers. <u>See</u> <u>Commonwealth v. Groome</u>, 435 Mass. 201, 217-218 (2001). However, the facts even as found by the motion court would not support a waiver whether verbal or not by the petitioner. The motion court found that the petitioner stated that he wanted to talk with the officers, but he "did not know what to do." This is at best equivocal and does not affirmatively establish that the petitioner waived his right to remain silent, and more importantly, that he waived his right to counsel. Even in cases where "an express statement that the individual is willing to make a statement and does not want an attorney closely followed by a statement could constitute a waiver." <u>Miranda</u> at 475. Additionally, while Groome's statements that he wanted to talk to the officers may have constituted a waiver of his right to remain silent, the issue is the petitioner did not voluntarily waive his right to counsel. Petitioner acknowledges that a defendant need not explicitly waive his <u>Miranda</u> rights. <u>North Carolina v. Butler</u>, 441 U.S. 369 (1979). But the law directs that the waiver be examined in the totality of the circumstances, which was not done here.

and not obtained by coercion and promises. Moran at 421. Further, the court's decision is contrary to clear federal law because the court did not evaluate several important factors: the coercion via the promised walk to a desperate man, the persistence of the officers in explaining the waiver; and the petitioner's physical and mental state.

Additionally, the court's finding that Groome's waiver was voluntary is an unreasonable application of clearly established law. The court's findings of historical facts are presumed correct but the ultimate determine to the voluntariness of Groome's waiver is subject to independent review by this Court. The facts found by the court did not support the legal conclusion that Groome's waiver was voluntary. The facts demonstrate that Groome was coerced into signing the waiver and that he did not waive his right to counsel. Groome's statements that he wanted to talk with the officers immediately followed by his statements that he "did not know what do" do not support a finding of waiver of his rights. It is an incorrect analysis to take Groome's statement that he wanted to talk to officers out of the "totality of the circumstances" and not to evaluate the statement in the context that Groome repeatedly stated that he did not know what to do and that he did not sign the waiver or indicate a waiver of his right to counsel. The petitioner had been physically sick several times. The petitioner had been in the company of police officers for several hours. He was shaking. He delayed the signing the waiver form for one hour and six minutes while the officers repeatedly explained the waiver form to him. The petitioner stated that he did not know what to do. The petitioner asked to go for a walk which the officers indicated that they would allow him to do if he signed the waiver form. The totality of the circumstances point to a conclusion that his waiver was not voluntary, and this Court should grant the petitioner relief for this violation.

23

**B. There is Clear and Convincing Evidence that the Petitioner Did Not Waive His Rights and Asked for An Attorney After He Was Placed In Custody and Subjected to Interrogation.**

Alternatively, there is clear and convincing evidence that the petitioner did not waive his right to an attorney. While habeas corpus courts are required to presume the correctness of a state court's findings of fact that presumption may be rebutted where the petitioner produces clear and convincing evidence to the contrary. See 28 U.S.C. § 2254 (d)(1). Here, there is clear and convincing evidence that the petitioner did not waive his right to an attorney. The motion judge found that the petitioner had asked for an attorney, a "solicitor." Specifically, the court found that the petitioner "made inquiry upon his arrival or shortly thereafter at the barracks as to whether he needed an attorney or solicitor, to use his term. I further find it credible that he was told that he was not under arrest and did not need one." See Exhibit "A" at p.6. To support this finding, the motion court had to find that the officers' testimony was not credible. Both officers testified that the petitioner had never asked for an attorney or a solicitor.

The petitioner signed the acknowledgment form of his Miranda rights at 4:11 p.m. and then signed the waiver of his Miranda rights at 5:17 p.m. Groome testified that during this period of time he told the officers that did not know what to do, which the motion court credited. Further, Groome testified that he asked for an attorney a second time during this interview between signing the acknowledgment and signing the waiver:

> A: Well, I told him, I said I didn't want — I didn't want to sign it [the waiver], I wanted to talk to an attorney.
>
> Q: Okay, Now you've just said that for the second time that day you said that?

24

A: The first time I told them that was when he told me that, that Elsie was dead.

Q: Okay. After you signed the top portion, they asked you to sign the bottom, right?

A: Yeah.

Q: Why didn't you?

A: Because I didn't want to.

Q: Did you tell them that?

A: Yeah.

Q: What were your words?

A: At first I told them I didn't know what to do. They told me to take my time, think about it. I told them it would be better if I talked to a lawyer because—

See Motion Transcript Volume II, pp. 379;382; 385.[20]

The petitioner's testimony that he re-asserted his right to consult with an attorney is clear and convincing given the other facts credited by the motion court.

Given the clear and convincing evidence that the petitioner twice asserted his right to consult with an attorney while he was in custody, this Court should order that the writ issue, as the law is clear on this point. Once the accused requests an attorney all interrogation of the accused must cease until counsel is provided. Edwards v. Arizona, 451 U.S. 477, 485-486 (1981). The evidence is clear that the officers did not obtain a lawyer for Groome or facilitate

---

[20]The motion judge did not credit Groome's testimony that he asked for an attorney between 4:11 p.m. and 5:17 p.m. See Exhibit "A" at pp. 6, 14. This Court should reject the finding as unsupported by the evidence. Demothenes v. Baal, 495 U.S. 731, 735 (1990). There was no testimony to the contrary, and courts are directed to indulge every reasonable presumption against the waiver of such rights. There would be no reason for Groome to ask for an attorney when he first arrived at the barracks and not after signing the Miranda acknowledgment.

that process, but rather the officers persisted in trying to obtain the petitioner's signature on the waiver form. The officers continued pressure on the petitioner after he had requested counsel again is a clear violation of Fifth Amendment that this Court should remedy.

## 3. The State Court's Decision Not to Instruct the Jury on Voluntary Manslaughter Was Contrary to Clearly Established Law

Both the Sixth Amendment and Due Process clause guarantee an individual's right to a trial by a jury. See U.S. Const. amends. VI & XIV. A critical component of this right is trial by an impartial jury which " its most important element [is] the right to have the jury rather than the judge, reach the requisite finding of 'guilty.'" Sullivan v. Louisiana, 508 U.S. 275, 277 (1993). This right necessarily prohibits judges from weighing the evidence and making credibility determinations as these are functions of the jury. See e.g., U.S. v. United States Gypsum Co., 438 U.S. 422, 446 (1978)(jury instruction that took question of intent from jury invaded the jury's fact finding role). An accused's right to due process is violated when the court fails to give an instruction on a lesser included offense where the evidence would support the instruction. Keeble v. U.S., 412 U.S. 205 (1973).

Here, there was evidence to support an instruction to the jury on voluntary manslaughter. Massachusetts law recognizes that sometimes words may serve as an adequate provocation to render an unlawful killing voluntary manslaughter. Commonwealth v. Benjamin, 430 Mass. 673, 680 (2000). Where the information conveyed is that a reasonable person would lose self-control and the information actually caused the defendant to lose self-control then the statement is sufficient. See Massachusetts Model Jury Instructions on Homicide at pp. 28-29 (1999). The

26

statement must be a "peculiarly immediate and intense offense to [the defendant's] sensitivities." Commonwealth v. Bermudez, 370 Mass. 438, 441-442 (1976). Massachusetts courts have instructed on voluntary manslaughter where a wife admitted to her husband that she had been engaging in adultery. Commonwealth v. Schnopps, 383 Mass. 178, 180-181 (1981). Here, the evidence presented was that the petitioner was informed by the victim that she had AIDS and that she had transmitted this gravely serious disease to him. The court impermissibly weighed this evidence and concluded that learning that your sexual partner had transmitted a serious disease to you was not sufficient for a reasonable person to lose control.

The court's decision that no error occurred by not instructing on voluntary manslaughter was contrary to Sullivan v. Louisiana, 508 U.S. 275 (1993) and Keeble v. U.S., 412 U.S. 205 (1973). Finding no error in failing to instruct on the lesser included offense of voluntary manslaughter was contrary to the guarantee that the jury– not the judge weigh the evidence. The petitioner's evidence cleared the bar and the court should have instructed the jury on the law of voluntary manslaughter and leave it to the jury to decide whether the petitioner had committed voluntary manslaughter as opposed to first degree murder.[21]

---

[21]The Supreme Judicial Court impermissibly ways the evidence by concluding that the short time that elapsed when the petitioner was informed by the victim that shw had given him AIDS and the petitioner going outside was sufficient for him to cool off. Id. at fn. 28. This was a jury question, The Supreme Judicial Court decision seems to be based on the idea that a defendant may only present one defense to the jury or that the defendant may not present alternative theories of defense.

**4. The Petitioner Received Ineffective Assistance of Counsel Because Trial Counsel Failed to Raise and Protect the Defendant's Rights under the Vienna Convention on Consular Relations as a Means to Suppress the Defendant's Statement And His Defense At Trial Was Inadequate**

### A. Standard of Review

The petitioner's claims of ineffective assistance of counsel were not reached by the courts of the Commonwealth of Massachusetts and therefore the standard of 28 U.S.C. § 2254 (d)(1) and Williams v. Taylor, 529 U.S. 362 (2000) are inapplicable. Both the Superior Court and the single justice of the SJC addressed the petitioner's claims that he received ineffective assistance of counsel in cursory decisions and did not reach the substance of the federal claim. Where the state courts did not reach the federal claim, the habeas court reviews the claim de novo. Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

### B. Counsel's Assistance Was Ineffective as a Matter of Law For Failing to Press the Petitioner's Rights Under the Vienna Convention of Consular Relations

A defendant accused of a crime is guaranteed the effective assistance of counsel for his defense. See U.S. Const. amend. VI. Where a defendant claims that he did not have the effective assistance of counsel he must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish that the defense suffered prejudice as a result of counsel's errors, the defendant must show that his right to a fair trial was deprived. Id. The effectiveness of counsel's assistance is a legal question subject to the federal habeas court's independent review. Strickland v. Washington, 466 U.S. 668, 698 (1984); Thompson v. Keohane, 516 U.S. 99, 113 (1995).

28

Here, counsel provided ineffective assistance to the defendant because he failed to seek to have the defendant's statement suppressed pursuant to the provisions of the Vienna Convention on Consular Relations of 1963. Counsel knew that the defendant, Peter Groome, was not a citizen of the United States of America. Counsel knew that he was a citizen of the Republic of Ireland and as such knew or should have known that Groome was entitled to special protections under treaties that the United States is a signatory.

The United Sates Constitution provides as follows:

> " This Constitution, and the Laws of the United States which shall
> be made in Pursuance thereof; and all Treaties made, or which shall
> be made, under the Authority of United States, shall be the supreme
> Law of the Land, and the Judges in every State shall be bound
> thereby, any Thing in the Constitution or Laws of any State to the
> Contrary notwithstanding."  (U.S. Constitution, article VI, cl. 2).

**The Vienna Convention on Consular Relations of 1963**

The United States of America is a signatory on the Vienna Convention on Consular Relations, and the treaty was ratified by the United States Senate on November 24, 1969. (See Vienna Convention on Consular Relations of 1963, TIAS 6820, 21 U.S.T. 77, 596 UNTS 261.) Article 36 of the Vienna Convention provides that:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a)   consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b)   if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district,

29

<u>a national of that State is arrested or committed to prison or to custody pending</u>
<u>trial or is detained in any other manner . . . The said authorities shall inform the</u>
<u>person concerned without delay of his rights, under this sub-paragraph;</u> (emphasis
added)

(c)    consular officials shall have the right to visit a national of the sending State who is
in prison, custody or detention, to converse and correspond with him and to
arrange for his legal representation. They shall also have the right to visit any
national of the sending State who is in prison, custody or detention in their district
in pursuance of a judgement. Nevertheless, consular officials shall refrain from
taking action on behalf of a national who is in prison, custody or detention if he
expressly opposes such action.

2. The rights referred to in paragraph 1 of the Article shall be exercised in conformity
with the laws and regulations of the receiving State, subject to the proviso, however, that
the said laws and regulation must enable full effect to be given to the purposes for which
the rights accorded under this Article are intended."

As provided in Article 36 (1)(b), the authorities of the receiving state (here, the United

States) shall without delay inform the detained foreign national of his right to have his consular

post notified of his detention. The International Court of Justice construed this provision in the

case of <u>Federal Republic of Germany v. United States</u>, 2001 I.C.J. 104. The International Court

of Justice held that the rights afforded under the Vienna Convention are individual rights. <u>Id.</u>

<u>Breard v. Greene</u>, 523 U.S. 371, 376 (1998).

Upon a showing of prejudice, a defendant deprived of his rights under the Vienna

Convention may be entitled to have the evidence seized in violation thereof suppressed. <u>Id.</u> at

377; <u>United States v. Nai Fook Li</u>, 206 F.3d 56, 60 (1st Cir. 2000)(Tourella, J.)(dissenting).

These treaties and the rights afforded to detained foreign nationals are the supreme law of

the land. <u>U.S. Constitution</u> Article VI, cl. 2.  Groome, a foreign national of the Republic of

Ireland, was not informed of these rights and had he been he would have contacted the Irish

Consulate.  Counsel at the suppression hearing made much of the fact that Groome was from

30

Ireland. Had counsel conducted some research he would have discovered, under this treaty, an additional basis to have the petitioner's statement suppressed.

In this case, Groome's attorney at the pretrial proceedings failed to raise the issue of Groome's right under the Vienna Convention. Groome clearly was entitled to be informed of his rights, and the police indisputably failed to do so.

Counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Had counsel raised Groome's rights as a foreign national, Groome would have had another basis to have his confession suppressed.[22] Counsel's failure to raise the defendant's rights under the treaty cannot be considered a strategic decision and therefore is subject to scrutiny. Failing to raise a basis that would have resulted in the petitioner's confession being suppressed is clearly ineffective assistance of counsel. The prejudice to the petitioner is most evident. His statement was not suppressed and it was used against him at his trial as very compelling evidence. Counsel's failure to raise the petitioner's rights under the Vienna Convention was ineffective.

**B.    The Expert Testimony, Comprising the Only Defense Presented at the Petitioner's Trial, Was Inadequate and As Such the Petitioner Received Ineffective Assistance of Counsel**

Counsel may be ineffective for failing to raise and/or investigate his client's mental health

---

[22]Suppression would have had a dramatic impact at trial. The defendant gave a verbal and a written statement to the police. In his statements to the police, the defendant confessed to killing Ms. Korpela, and he provided them with details of all his actions after he did so, including his efforts to dispose of the tool used to kill her and its approximate location. The written statement was admitted into evidence as Exhibit 44 at trial. Needless to say, the defendant's statement given without the aid of counsel or access to his consulate was most powerful evidence.

31

if there is a basis for such a defense. <u>Wiggins v. Smith,</u> 123 S. Ct. 2527 (2003). Another corollary to this principle is that counsel is ineffective if the expert testimony presented is not correct or is inadequate and counsel's investigation could have discovered this fact. This is the case here. The defendant received ineffective assistance of counsel because the expert testimony, provided by Dr. Alan Brown, was "fundamentally incorrect." <u>See</u> Exhibit "G" Affidavit of Dr. Peter Cohen ¶ 9.

Dr. Peter Cohen, retained by Groome in connection with his motion for new trial in the Superior Court, reviewed the defendant's extensive medical records and psychiatric evaluations, and the expert testimony provided by Dr. Alan Brown. ( <u>See</u> Exhibit "G"at ¶ 3-5 ).   From his review, Dr. Cohen concluded that the testimony presented at trail concerning Intermittent Explosive Personality disorder is " fundamentally incorrect" because the petitioner's psychiatric history does not support this conclusion. ( <u>Id.</u> at ¶ 9).   Dr. Cohen opines that the defendant may have lacked  the requisite intent required for first degree murder. (<u>Id.</u> at  ¶ 6, 11).

The defendant did not receive effective assistance because his expert provided testimony that was inaccurate.  The expert testimony being "fundamentally incorrect" failed to provide the defendant with a defense at all.  If the proper expert testimony had been presented at trial, the jury would have found the defendant not guilty of first degree murder, since the necessary mens rea element would have been missing.

In Massachusetts, first degree murder is the unlawful killing of another with malice aforethought with deliberate premeditation, or with extreme atrocity and cruelty, or in the commission of a crime punishable by life. <u>Commonwealth v. Judge</u>, 420 Mass.. 433, 437 (1995); M.G.L. c. 265 § 1. A defendant's mental impairment may negate a finding of first degree murder

32

under the theory of deliberate premeditation or the theory of extreme atrocity and cruelty. Commonwealth v. Meinholz, 420 Mass. 633, 637-638 (1995). Second degree murder differs from first degree murder in that it not murder committed with deliberate premeditation [or extreme atrocity and cruelty]. Commonwealth v. Hicks, 356 Mass. 442, 444-445 (1969). Murder that is not in the first degree is murder in the second. M.G.L. c. 265 § 1.

The prejudice suffered by the defendant is clear. Having given inaccurate testimony to the jury is akin to having offered no testimony to the jury at all. If the jury had heard evidence about the defendant's actual mental illness, there is a reasonable probability that they would have not found him guilty of first degree murder, but rather murder in the second degree. Strickland v. Washington, 466 U.S. 668, 687 (1984); Wiggins v. Smith, 123 S. Ct. 2527 (2003). Because the petitioners did not receive the effective assistance of counsel, this Court should grant him relief.

## II. The Court Should Deny Respondent's Motion to Dismiss As The Petitioner's Application Was Timely Filed

The respondent argues that the petitioner's application for a writ of habeas corpus was not timely filed by five (5) days. This argument is incorrect for several reasons.

A brief review of the procedural history is in order. Petitioner's conviction was affirmed on direct appeal by the Supreme Judicial Court in a corrected decision dated October 22, 2001. Petitioner had one year from the affirmance to file a habeas corpus petition. See 28 U.S.C. §2244 (d)(1). The period is further enlarged by the ninety day period for the petitioner to seek a writ of certiorari. See 28 U.S.C. §2244 (d)(1)(A). That period is stayed while the petitioner exhausts his state right to collaterally challenge the conviction. See 28 U.S.C. § 2244(d)(1)(A)(2). Groome timely filed his state court motion pursuant to Mass.R.Crim.Pro. 30 on January 2, 2003. The

motion was denied, and the Massachusetts Supreme Judicial Court ("SJC") affirmed in a decision that was docketed in the Superior Court on November 24, 2003.

The respondent, relying on incorrect dates, argues that the petition was not timely filed. The argument is based on the flawed premise that the one-year period began running on the same date as the SJC issued its initial, uncorrected opinion and that the tolling period ceased on the date the SJC issued its decision denying Groome's gatekeeper petition rather than the date the decision was docketed in the Supreme Court.

As a preliminary matter, the date on which a court's decision is issued does not restart the statute of limitations. The clock begins to run the day after the court's decision. See e.g., Fed.R.Civ. P. 6(a) Computation ("In computing any period of time prescribed or allowed by these rules... or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included."); Donovan v. State of Maine, 276 F.3d 87, 90-91 (1st Cir. 2002)("the Law Court denied [the appeal] . . . on December 22,1999, the court resumed the count as of December 23."). Thus, respondent's calculation is incorrect because it counts the days the particular court's decisions were issued.  The respondent restarts the clock on the day the Supreme Judicial Court ("SJC") issued its (uncorrected) decision on the petitioner's direct appeal and respondent again restarts the clock the day the single justice of the SJC denied the petitioner relief under G.L. c. 278, § 33E. Thus, even assuming the correctness of the respondent's other calculations, the petitioner's application was only filed three (3) days shy of the limitations period.

However, the petitioner's application was timely filed because the SJC's decision on his direct appeal did not become final until October 22, 2001 and the statute of limitations was tolled

34

while he sought "other collateral relief." On November 20, 2002, the defendant filed a motion

with a supporting affidavit for funds to hire a forensic expert. On December 3, 2002, the Court

denied the motion for funds stating that the motion was premature. The Court apparently

misapprehended the Commonwealth's amendment to Mass. R. Crim. P. 30.[23] On December 4,

2002, the defendant filed a motion for reconsideration which was granted by the Court on

December 6, 2002. The defendant filed his motion for new trial on January 2, 2003.


**1. The Decision On the Petitioner's Direct Appeal Was Not Final Until January 21, 2001**

The statute of limitations for a petitioner to file an application for a writ of habeas corpus

is one year from the time the petitioner could have sought review of the state court judgment in

the United States Supreme Court. The statute provides:

> A 1-year period of limitation shall apply to an application for a writ
> of habeas corpus by a person in custody pursuant to the judgment
> of a State court. The limitation period shall run from the latest of–
>
> > (A) the date on which the judgment became final by the
> > conclusion of direct review or the expiration of the time for
> > seeking such review. See 28 U.S.C. §2244 (d)(1)(A).

The one year of statute of limitation began to run ninety days after the petitioner could

---

[23]Mass. R. Crim. P. 30 was amended on September 6, 2001, effective October 1, 2001. One of the changes to the rule was that the court upon a proper showing was authorized to grant the defendant funds to prepare his motion for new trial. The rule was amended to include the following " [t]he court, after notice to the Commonwealth and an opportunity to be heard, may also exercise its discretion to allow the defendant costs associated with the preparation and presentation of a motion under this rule." The decision was erroneous because it overlooked that the revised rule provided that the Court could grant the petitioner funds in order to preliminarily obtain the necessary experts to present his motion. Groome, through counsel, pointed out the errors to the court by means of a motion for reconsideration.

have had the decision on his direct appeal reviewed by the United States Supreme Court. A corrected decision in the petitioner's case was issued on October 22, 2001. See Commonwealth v. Groome, 435 Mass. 201 (2001). It is from this date that the ninety (90) days from which the petitioner could have filed in the United States Supreme Court began to run. Accordingly, the decision to which the petitioner is subject to incarceration did not become final until January 21, 2001, and the one year would not have expired until January 21, 200. Thus, Groome's present application for a writ of habeas corpus is timely.

## 2. The Petition is Timely Because The Statute of Limitations Was Tolled During The Time Which the Petitioner Spent Seeking Other Collateral Relief, Including the Sixteen Days the Petitioner's Motion For Funds Was Before the Trial Court

The time limitations period for filing a petition for habeas corpus review is tolled "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgement or claim is pending. . . ." See 28 U.S.C. § 2244(d)(1)(A)(2). The tolling provision assists a habeas petitioner in complying with his obligation to exhaust his remedies before the state courts. Here, the petitioner's application for a writ of habeas corpus is timely because he was diligently seeking to exhaust his claims in the courts of the Commonwealth of Massachusetts prior to filing in the federal courts. A petition for habeas corpus will not be granted unless " the applicant has exhausted the remedies available in the courts of the State." See 28 U.S.C. 2254 (b)(1)(A). As the First Circuit Court of Appeals has recognized, Massachusetts' G.L. c. 278, § 33E is unique in that affords a defendant convicted of a "capital" offense broad review on direct appeal and review on a denial of motion for new trial if the gatekeeper justice finds that the defendant has presented a "new and substantial question." Currie v. Matesanz, 281 F.3d 261 (1st Cir. 2002). Accordingly, the petitioner may have faced a

36

claim that he did not exhaust his remedies if he had not proceeded with his motion for new trial. See O'Sullivan v. Boerckel, 526 U.S. 838 (1999)(petitioner must exhaust claims by seeking discretionary review of claims in state court). On November 20, 2002, the petitioner filed a motion with a supporting affidavit for funds to hire a forensic expert. On December 3, 2002, the court denied the motion for funds stating that the motion was premature. The court apparently was unaware of the change to Mass. Crim. R. P. 30 or misapprehended the amendment to the rule. The petitioner spent sixteen (16) days before the trial court trying to obtain funds to proceed with his motion for a new trial.

The petitioner's claim for collateral review of his conviction includes the time he spent attempting to secure funds to proceed with the filing of his new trial motion. The petitioner's motion for funds to hire a forensic expert was an application for post conviction relief as understood by Massachusetts' law. As noted supra., Mass. R. Crim. P. 30 was recently amended to permit defendants as a part of the post conviction procedure to obtain funds. Mass. R. Crim. P. 30 outlines the available grounds for relief from a conviction and the procedure to obtain that relief. Petitioner's motion for funds was a part of that procedure to seek relief and collaterally attack his conviction. In both his motions for funds for an expert and for reconsideration, the petitioner sought relief from his conviction under Mass. R. Crim. P. 30. In both motions, the petitioner states the grounds for his request for relief– that the expert testimony offered at his trial was inadequate.   Cf. Voravongsa v. Wall, 349 F.3d 1 (1st Cir. 2003).

Because the statute of limitations was tolled while the petitioner pursued all other collateral relief available to him in the courts of the Commonwealth, including the time he spent trying to obtain funds, the petitioner's application is timely filed.

### 3. <u>Petitioner's Application For Other Collateral Review Was Pending Until November 24, 2003 When The Supreme Judicial Court's Order Was Received By The Trial Court</u>

Further, Groome's application for other collateral review was pending until the Supreme Judicial Court's order was issued on November 24, 2003. An application for collateral review is pending until it is finally determined as defined by state law. <u>Bunney v. Mitchell</u>, 262 F. 3d 973 (9th Cir. 2001). A decision of the appellate courts of the Commonwealth of Massachusetts "does not come into existence until the document embodying the order contained within that writing is transmitted to the lower court." <u>Commonwealth v. Aboulaz</u>, 44 Mass. App. Ct. 144, 148 (1998).

Here, the decision of the Supreme Judicial Court did not become effective as a matter of Massachusetts law until the court's order had been transmitted to the trial court on November 24, 2003. <u>See</u> Docket Sheet attached hereto as Exhibit "H." The petitioner filed his habeas corpus petition in this Court two days later, November 26, 2003. Thus, the petitioner's application is timely.

### 4. <u>Equitable Tolling is Appropriate Because the Trial Court Delayed the Petitioner's Motion for New Trial and the Petitioner Pursued Exhausting His Claims with Reasonable Diligence.</u>

In <u>Duncan v. Walker</u>, 533 U.S. 167, 183 (2001) the U.S. Supreme Court recognized the availability of the doctrine of equitable tolling of the one year statute of limitations under the Anti-Terrorism and Effective Death Penalty Act. Equitable tolling is available where a litigant was prevented by some extraordinary circumstances out of his control that prevented him from

38

pressing his rights. <u>Delaney v. Matesanz</u>, 264 F. 3d 7, 15 (1st Cir. 2001). Further, the courts apply their powers of equity where the petitioner has pressed his claims with diligence. <u>Id</u>.

Both of these factors are present here. But for the defendant's indigency and or the trial court's misunderstanding of the change to Mass. Crim. P. 30 concerning funds for indigent defendants to bring a new trial motion, the petitioner would have filed his motion for a new trial prior to January 2, 2003. The petitioner filed a motion for funds on November 20, 2002. The Court denied his motion thirteen days later on December 3, 2002. Following the receipt of the court's denial the petitioner filed for reconsideration on December 4, 2002. On December 6, 2001, the Court granted his motion for funds. Only 27 days later the defendant filed his motion for new trial accompanied by his expert psychiatrist's affidavit. The defendant spent sixteen days trying to obtain the necessary funds to hire an expert to review the expert testimony offered at his trial and perform an psychiatric evaluation of him. Petitioner pursued all avenues to exhaust his claims before the courts of the Commonwealth and did so with reasonable diligence. <u>See e.g.</u>, <u>Wojcik v. Spencer</u>, 198 F.2d 1 (D.Mass. 2002)(statute of limitations equitably tolled where mixed petition was before district court for 276 days and then dismissed for failure to exhaust claims).

Further, in support of his argument for equitable tolling, the petitioner suggests that not to apply these equitable principles would deny him equal protection of the law and equal access to the courts. The U.S. Supreme Court has recognized that the equal protection and due process clauses require that if the state provides an appellate process, the process must be accessible to both indigent and affluent defendants alike. <u>See e.g.</u> <u>Johnson v. Avery</u>, 393 U.S. 483 (1969); <u>Griffin v. Illinois</u>, 351 U.S. 12 (1956). Similarly, an indigent defendant's access to the writ of

habeas corpus cannot be curtailed. "Since the basic purpose of the writ is to enable those

unlawfully incarcerated to obtain their freedom, it is fundamental that access of prisoners to the

courts for the purpose of presenting their complaints may not be denied or obstructed." <u>Johnson</u>

<u>v. Avery</u>, 393 U.S. 483, 485 (1969). Fundamental fairness and equal access to the courts require

that the time a defendant is seeking funds to challenge a conviction collaterally must be tolled.

To hold otherwise is to deny the indigent petitioner equal protection of the laws and access to the

writ. The petitioner requests that this Court equitably toll the statute of limitations and find that

his application is timely.

## **CONCLUSION**

For the above reasons, the petitioner respectfully asks this Court to grant a writ of habeas

corpus.

Respectfully submitted,
PETER GROOME
By his attorneys,

Joseph S. Berman, BBO No. 566006
Berman & Dowell
210 Commercial St.
Boston, MA 02109
Telephone (617) 723-9911

Dated: February 19, 2004

40

## CERTIFICATE OF SERVICE

I, Elizabeth L. Bostwick, Esq., hereby certify that on this 19th day of February, 2004 I served a copy of the foregoing by first class mail, postage prepaid to: Maura D. McLaughlin, Assistant Attorney General, Criminal Bureau, One Ashburton Place, Boston, MA 02108.

Elizabeth L. Bostwick

41